## The Market Street National Bank of Shamokin v. Staniszewski

*James J. Purcell,* for plaintiff.
*Frank E. Garrigan,* for defendant.

KREHEL, *P.J.,* January 28, 1977 — This is a case of first impression concerning the applicability of the Act of January 30, 1974, P.L. 13, 41 P.S. §403 et seq., commonly referred to as Act No. 6, to a mortgage foreclosure proceeding initiated *after* the effective date of the act, but based on a mortgage entered into *prior* to such effective date.

Significantly, this is a residential mortgage. This court is guided by the in-depth briefs of counsel as maps to follow the chronology of events. The dispute of the parties is attributable to the misun-

derstanding of such events in light of, or because of the darkness caused by, the coming of Act No. 6. The parties require the fixing of guideposts to reach a plateau of resolving their controversy, which may point the direction for future journeys of lending capital.

Defendants, Francis D. Staniszewski and Eleanor Staniszewski, entered into a mortgage agreement with plaintiff, The Market Street National Bank of Shamokin, Pennsylvania, on June 29, 1971. This residential mortgage, on premises located at 1724 Raven Avenue, Township of Coal (Post Office Shamokin), Northumberland County, carrying an interest rate of seven and one-half percent per annum, was in the amount of $8,000. The mortgage was duly recorded July 1, 1971, in the Office of the Recorder of Deeds of Northumberland County in Mortgage Book 335, at page 997. The monthly payments were in the amount of $94.97, and, according to plaintiff, the last such payment, made on August 19, 1974, was credited to accrued interest. Plaintiff further avers that the last payment on the principal of the mortgage was made on March 31, 1975.

The mortgage agreement in question contains the following pre-printed legalese:

"And the further condition of the said Obligation is such, that if at any time default shall be made in the payment of principal, interest, taxes or insurance as aforesaid, for the space of thirty (30) days after any payment thereof shall fall due, or if a breach of any other of the foregoing conditions be made by said Mortgagors, their heirs, executors, administrators or assigns, the said principal sum shall become due; and payment of the same, with the interest, taxes and costs of insurance due thereon, as aforesaid, together with

an attorney's commission of fifteen (15%) per cent on the said principal sum, besides costs of suit, may be enforced and recovered at once." Mortgage Book 335, at page 997.

"AND PROVIDED also, that it shall and may be lawful for the said Mortgagee, its successors or assigns, when and as soon as the said principal sum shall, in any event, become due and payable as aforesaid, to commence forthwith an action of Mortgage Foreclosure upon this Indenture of Mortgage, and proceed thereon to judgement and execution for the recovery of said principal sum and all interest due thereon, and the costs and expense of insurance, and taxes as aforesaid, together with an attorney's commission of fifteen (15%) per cent on said principal sum, besides costs of suit, without stay of or exemption from execution or other process with a full release of errors." Mortgage Book 335, at page 999.

Relying on these provisions, plaintiff bank contends that defendants were in default when they failed to make a payment within 30 days after March 31, 1975.

Plaintiff further contends that, upon such default, it may immediately commence an action of mortgage foreclosure for the recovery of the principal sum, together with an attorney's commission of 15 percent, plus costs of suit.

The following letter, accordingly, dated October 1, 1975, was sent to defendants:
"Francis D. Staniszewski
Eleanor Staniszewski
1728 Raven Avenue
Shamokin, Pennsylvania 17872

"In Re: Francis D. Staniszewski and
        Eleanor Staniszewski

"TO

"The Market Street National Bank
Of Shamokin, Pa.
Mortgage dated June 29, 1971
    recorded July 1, 1971
Mortgage Book 335 page 997
Northumberland County
Amount $8,000.00
Covering part of lots 2, 3, 4, and 5
block 92, Edgewood, Coal Township, on
which is erected a dwelling house No. 1724 Raven
Avenue

"Dear Mr. and Mrs. Staniszewski:

"As attorney for the Market Street National Bank, I am herewith notifying you, by Certified Mail, of the intention of The Market Street National Bank to commence an Action of Mortgage Foreclosure pursuant to the terms of the above referred Mortgage against the premises covered by the said Mortgage Lien, at 1724 Raven Avenue, Shamokin, Pennsylvania.

"The purpose of this letter is to give you thirty (30) days notice of such intention.

"You are further notified that you are in default of the above referred Mortgage, with your last actual payment on principal having been made on March 31, 1975 and your last actual payment which was credited with accrued interest, made August 19, 1975. You are further notified that the total delinquency owed by you, as of October 8, 1975, including all accrued interest and late charges, amounts to a sum of Six Thousand Forty-eight dollars and Thirty-one Cents ($6,048.31). Payment of this sum within a period of thirty (30) days from receipt of this letter will correct the default and pay the Mortgage in full.

"Failure to pay the amount as designated will lead to Mortgage Foreclosure and sale of your property by Sheriff's Sale in order to realize the balance due.

"You have the right to obtain other financing from any other source you may choose in order to correct this default.

"You are also further notified that the figures quoted in this letter are good only for a period of thirty (30) days and once legal action has been commenced, Court costs and fees will then be added to this amount.

"Very truly yours,

"/S/ James J. Purcell

"JAMES J. PURCELL

"JJP:jd"

The present action to recover $6,940.81 was instituted on November 17, 1975. This amount represents the $6,048.31 principal sum, together with the attorney's commission of $892.50. Plaintiff is additionally demanding that defendants pay interest on the principal from October 8, 1975.

Defendants deny in their answer that the mortgage is in default. They assert to the contrary that they have made every effort to bring the mortgage current. Particularly, they claim to have made a payment of $500 on October 14, 1975. Such payment was accepted by plaintiff, but, contrary to defendants' specific instructions, it was credited to another outstanding loan account rather than to the mortgage account.

Defendants also insist that they proffered a $500 payment on October 22, 1975, and a $1,000

payment on November 10, 1975, both of which were refused by plaintiff.

To the extent, moreover, that such payments have been proffered, defendants contend that interest on the obligation ceased to run.

By way of new matter, defendants additionally invoke the protective provisions of the Act of January 30, 1974, P.L. 13, 41 P.S. §403 et seq; commonly known as "Act No. 6." Section 403 of this act requires that before any residential mortgage lender may accelerate the maturity of a residential mortgage obligation, a 30 days notice of such intention together with notice of the mortgagor's statutory right to cure such default must be given.[1]

This latter right is such that a residential mortgage lender may cure a default by paying, in the form of cash or cashier's check, all sums which would have been due at the time of payment in the absence of default and the exercise of an acceleration clause.[2]

Defendants claim that the above-quoted letter dated October 1, 1975, does not fulfill the prerequisite requirements to the commencement of a residential mortgage foreclosure action, despite the fact that defendants' attorney personally informed plaintiff of the provision of Act No. 6. Defendants, thereby, insist that (1) the principal amount

---

1. 41 P.S. §403: "Notice of intention to foreclose. (a) Before any residential mortgage lender may accelerate the maturity of any residential mortgage obligation . . ."

2. 41 P.S. §404: "Right to cure a default. (a) Notwithstanding the provisions of any other law, after a notice of intention to foreclosure has been given pursuant to section 403 of this act, at any time at least one hour prior to the commencement of bidding . . . the residential mortgage debtor . . . may cure his default . . . ."

is not due and owing, and (2) no commission for plaintiff's attorney is payable.[3]

In a counterclaim, furthermore, defendant's request that credit for the October 14, 1975, payment be transferred from the outstanding loan account to the mortgage account, and that plaintiff pay defendants' costs, expenses and reasonable attorney's fees, inasmuch as section 503 of Act No. 6, 41 P.S. §503, authorizes the payment of such amounts in cases where the lender violates the provisions of the act.

Plaintiff bank has filed preliminary objections to defendants' answer, new matter and counterclaim. In these objections, plaintiff concedes that the letter of October 1, 1975, does not comply with the provisions of Act No. 6. Plaintiff does insist, however, that the provisions of Act No. 6 were not intended to apply to the present case, and that, even if such application were intended, it would be an unconstitutional impairment of contractual rights. It is these specific issues that are now before this court.

## DISCUSSION AND CONCLUSIONS OF LAW

The initial question to be considered by this court is: Whether the General Assembly intended that certain protection provisions of Act No. 6 apply to a *residential* mortgage retroactively, i.e., one entered into approximately two and one half years *prior* to the effective date of the act?

---

3. 41 P.S. §406: "Attorney's fees payable. With regard to residential mortgages, no residential mortgage lender shall contract for or receive attorney's fees from a residential mortgage debtor except as follows:

"(1) Reasonable fees for services included in actual settlement costs."

An examination of the statutory language reveals no specific mention of such pre-existing mortgage agreements. This court's research extended into reviewing the legislative debate on what was then Senate Bill 1255, which, regrettably, did not illuminate this particular subject, generating more heat than light. See Legislative Journal: Senate — December 4, 1973, Vol. 1, No. 82, pp. 1211-1212; Senate — January 15, 1974, Vol. 1, No. 90, pp. 1332-1336; House of Representatives — January 30, 1974, Vol. 1, No. 108, pp. 3269-3276. This court, nevertheless, believes that there is a sufficient manifestation of the intent of the General Assembly to apply these protective provisions of Act No. 6 to pre-existing residential mortgage agreements, i.e., retroactively.

Section 403, for example, dealing with notice of intention to foreclosure, speaks in terms of *"any residential* mortgage lender" and *"any residential* mortgage obligation"* (emphasis added). This is in sharp contrast to the language of section 405[4] which limits its applicability to "residential mortgage obligations contracted for on or after the effective date of this act. . . . "

More clearly, the General Assembly, while not mentioning pre-existing mortgage agreements as such, has sufficient mastery of the English language to exclude any such agreements from the thrusting reach of Act No. 6 if that were its intent. It chose to make that exclusion only with regard to the prohibition of prepayment penalties. No other

---

4. 41 P.S. §405: "Prepayment penalty prohibited. Residential mortgage obligations contracted for on or after the effective date of this act may be prepaid without any penalty or other charge for such prepayment at any time before the end of the period of the loan."

exclusions were made, and we must assume that no more were intended.

This court concludes, therefore, that the protective provisions of Act No. 6 which (1) grant a residential mortgage debtor the right to cure a default; (2) require that a residential mortgage lender give notice of intention to foreclosure; and (3) prohibit the collection of attorney's fees for expenses incurred during the 30-day notice period, were intended to apply to a pre-existing mortgage agreement, i.e., retroactively.

The second and final question we decide here is, emphasizing the fact that we interpret the intent of the General Assembly to apply certain protective provisions of Act No. 6 to pre-existing residential mortgages: Is such an application a constitutional impairment of a contractual right?

Article I, sec. 17, of the Constitution of the Commonwealth of Pennsylvania provides that:

"No ex post facto law, nor any law impairing the obligation of contracts or making irrevocable any grant of special privileges . . . shall be passed."

Article 1, sec. 10, of the United States Constitution, places a similar restriction upon the States.

Counsel for plaintiff bank cites what he believes is the definitive interpretation of the Pennsylvania Contract Clause: Beaver County Building and Loan Association v. Wenowich, 323 Pa. 483, 187 Atl. 481 (1936).

In that case, our State Supreme Court declared unconstitutional the Mortgage Deficiency Judgment Act of January 17, 1934, P.L. 243, which had compelled a mortgagee to accept realty at its appraised value in place of cash as part of the liquidation of mortgagor's obligation on his bond. This case also contains much dicta concerning strict interpretation of the contract clause.

This court, however, construes that the actual holding of Wenowich, together with its ultraconservative dicta, is not controlling in the instant case.

We distinguish them. Initially the facts of the two cases are completely different.Wenowichdealt with a statute which attempted to substitute real estate at an appraised valuation for money due under a mortgage agreement. In the instant case, Act No. 6 makes no such substitutions. Neither section 403, nor 404 of Act No. 6, deprive a residential mortgage lender of any moneys owed to it under the mortgage agreement.

The lender is precluded only from accelerating the maturity of the entire obligation until after the residential mortgage debtor is given notice and an opportunity to exercise his right to cure a default.

And if this right is so exercised, the debtor must pay certain reasonable fees incurred by the lender as a result of instituting the foreclosure proceedings, and may also be liable for the additional interest which accrued as a consequence of the late payment.

This court feels, more importantly, that Wenowich itself is no longer good law. The Pennsylvania Supreme Court, subsequent to Wenowich, has sustained minimum price regulations which modified the price terms of an existing contract: Zeuger Milk Co. v. Pittsburgh School District, 334 Pa. 277, 5 A.2d 885 (1939). In that case, the court recognized that ' "[t]he constitutional protection of the obligation of contracts is necessarily subject to the police power of the state, and therefore a statute passed in the legitimate exercise of the police power will be upheld by the courts, although it incidentally destroys existing

contract rights. . . .' ": 334 Pa. at 280, 5 A. 2d at 886 (other citation omitted).

Our highest appellate court, moreover, sustained the constitutional validity of the Mortgage Deficiency Judgment Act of 1941, with Justice Stern, the author of Wenowich, specifically concurring: Fidelity-Philadelphia Trust Co. v. Allen, 343 Pa. 428, 22 A.2d 896 (1941).

The most recent expression that the contract clause is subservient to the police power is contained in DePaul v. Kauffman, 441 Pa. 386, 272 A.2d 500 (1971).

In that case, our State Supreme Court rejected constitutional challenges to the Rent Withholding Act of 1966. The court noted that " ' "The interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising such powers as . . . are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected." ' " Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 437, 54 S. Ct. 231, 240, 78 L. Ed. 413 (1934); 441 Pa. at 398-99, 272 A.2d at 506-07.

This court strongly believes that the General Assembly, a representative body, legitimately exercised its police power to insure the general welfare despite the fact that certain pre-existing contract rights might *incidentally* be impaired.

The Commonwealth, after all, has a legitimate interest not only in seeing that its citizens are able to *obtain* adequate housing, but also in giving them every *reasonable* opportunity to *keep* their homes.

The quotable quote of one of our Founding Fathers, Thomas Jefferson, appears apropos:

"I am not an advocate for frequent changes in laws and constitutions, but laws and institutions must go hand in hand with progress of the human mind. As that becomes more developed, more enlightened, as new discoveries are made, new truths discovered and manners and opinions change, with the change of circumstances, institutions must advance also to keep pace with the times. We might as well require a man to wear still the coat which fitted him when a boy as civilized society to remain ever under the reegimen of their barbarous ancestors."

In Act No. 6 the intent of the legislature was to allow the man of today to put aside his boyish clothes. And, armed with its police power, as well as the interpretation of this court as a co-equal branch of government, such legislative intent gives direction to our lending institutions, so that they may "advance . . . to keep pace with the times." The Courts, "without the sword or the purse," nonetheless, have power to enforce their orders to sustain such legislative intent.

Accordingly, the court enters the following

### ORDER

And now, January 28, 1977, plaintiff's preliminary objections to defendants' answer and new matter are dismissed. Defendants counterclaim is allowed.